2020 IL App (2d) 191149-U
No. 2-19-1149
Order filed August 25, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF THERESA WILLIAMS, n/k/a Theresa Paradiso, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 11-D-1105 |
| | ) | |
| PATRICK WILLIAMS, | ) | Honorable |
| | ) | Joseph J. Bruce, |
| Respondent-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE BIRKETT delivered the judgment of the court.
Justices Hutchinson and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court's order modifying the allocation of parenting time and ordering the parents to equally share parenting time was not against the manifest weight of the evidence, and its denial of petitioner's motion *in limine* seeking to bar certain documents and witness testimony was not an abuse of discretion. Therefore, we affirmed.

¶ 2    In this post-decree matter, respondent, Patrick Williams, appeals the order of the circuit court of Winnebago County modifying the allocation of parenting time with his daughter, V.W., whom he shares with petitioner, Theresa Paradiso. Under the parties' prior co-parenting agreement, V.W. resided with Theresa approximately 60% of the time and with Patrick the

remaining 40%. Following an extensive hearing on Patrick's motion to modify the allocation of parenting time, wherein he sought the majority of parenting time, the circuit court granted the motion but entered an order providing an equal allocation of parenting time between the parties. Patrick contends on appeal that, although the circuit court correctly found there was a substantial change in circumstances that necessitated a change in the allocation of parenting time, it erred in allocating the parenting time equally rather than providing him with the majority of parenting time.

¶ 3    We initially note that this appeal was accelerated under Illinois Supreme Court Rule 311(a) (eff. July 1, 2018) because it concerns a final order related to the allocation of parental responsibilities. Under this rule, the appellate court is required to issue its decision within 150 days after the filing of the notice of appeal unless there has been "good cause shown." Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). Patrick filed his notice of appeal on December 30, 2019, and this court's disposition was therefore due by May 28, 2020. However, Patrick sought and was granted numerous extensions of time to file his appellant's brief, citing difficulties in obtaining transcripts from the relevant hearings and material omissions to the record on appeal necessitating supplementation. The extensions resulted in some 10 weeks' worth of delays in the briefing schedule. Patrick's opening brief was ultimately filed on May 4, 2020. Theresa then filed her appellee's brief on May 26, 2020, and Patrick thereafter filed his reply brief on June 8, 2020. Briefing was therefore not completed until after the 150-day deadline had passed. Moreover, we note that the record on appeal consisted of a 720-page common law record, a nearly 1600-page report of proceedings, and more than 400 pages of exhibits. These circumstances constitute good cause for filing our decision beyond the 150-day deadline. We now issue our disposition and, for the reasons stated, affirm.

¶ 4                          I. BACKGROUND

¶ 5    Patrick and Theresa were married on May 17, 2008.  Their marriage resulted in one child, V.W., born in 2009.  Theresa filed a petition for dissolution of marriage on August 23, 2011, and the circuit court appointed attorney Kimberly McKenzie as V.W.'s guardian *ad litem* (GAL).  The marriage was dissolved on April 25, 2013.  Pursuant to a co-parenting agreement, Theresa was awarded primary physical custody of V.W., subject to Patrick's right to visitation according to the following repeating two-week schedule: Week One: Wednesday overnight to Thursday morning and Friday after school to Monday morning; Week Two: Wednesday overnight to Friday morning. This arrangement resulted in V.W. residing with Theresa approximately 60% of the time and Patrick the remaining 40%.

¶ 6    On November 29, 2017, Patrick filed a motion to modify the allocation of parenting time between the parties, from which this appeal spawned, seeking the majority of parenting time with V.W.  He alleged a substantial change in circumstances in multiple respects, which we group into the following four broad categories:  (1) Schooling: V.W. was absent or late to school 54 times in the prior three school years during Theresa's parenting time, Theresa refused to properly exchange V.W.'s school uniforms with Patrick for school days during his parenting time, and Theresa withheld school information from Patrick, such as the deadlines for V.W's school assignments, and similarly neglected V.W.'s homework, leaving those items for Patrick to complete with V.W. during his parenting time; (2) Negative Statements:  Theresa made negative statements to V.W. about Patrick, such as that he was a "black sinner and does not believe in God," that he is a mean and bad father, that she would never have a happy and normal childhood with him, that he had done "crazy things" to her and that he had "bad pictures" of her on his cellphone, and that the police were going to go to his house to look at his computer; (3) Theresa's Residence and its Effect on V.W.'s Health: Theresa's residence was disorderly and dirty with animal feces such that, in the

prior two years, V.W. had been hospitalized for salmonella, and another resident of Theresa's household was hospitalized for salmonella and respiratory illnesses, and Theresa was also responsible for V.W. contracting hand, foot, and mouth disease; and (4) Journaling: Theresa directed V.W. to maintain a journal to document her negative experiences with Patrick.

¶ 7    The circuit court re-appointed attorney McKenzie as the GAL on January 16, 2018, and additionally appointed Dr. Mark L. Goldstein on April 17, 2018, as a professional custody evaluator pursuant to 750 ILCS 5/604.10(b) of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/604.10 (West 2018)).

¶ 8                    Dr. Goldstein's Custody Evaluation

¶ 9    Dr. Goldstein, a licensed clinical psychologist, submitted his "Child Custody Evaluation" report dated September 10, 2018.  According to the report, Patrick sought to modify the allocation of parenting time for several reasons, "particularly the number of tardies [*sic*] that [V.W.] has had in school under her mother's care, as well as corporal punishment, [V.W.] being ill frequently[,] and the lack of cleanliness at Theresa's home."  Dr. Goldstein detailed more than a dozen concerns that Patrick related to him, namely that: (1) Theresa had made negative comments to V.W. about him and his wife, Rena; (2) Theresa improperly accused he and Rena of child pornography related to a photo of V.W. in a bathtub when she was four years old; (3) Theresa cut V.W.'s hair just prior to his wedding; (4) V.W. had been tardy to school over 50 times; (5) Theresa's home was unclean, which he believed caused V.W. to become sick with salmonella; (6) he purchased seven school uniforms for V.W. but only one was at his home; (7) Theresa sends V.W. to school without glasses even though he purchased three pair for her; (8) Theresa had sent V.W. to school in snow boots and she had no shoes for gym class as a result; (9) Theresa lies constantly; (10) he was worried that Theresa would try to move with V.W. out of state; (11) Theresa blamed V.W. for her former

paramour, Jason Privett, moving out of her home; (12) Theresa instructed V.W. to make "bad pictures" of him in her journal; (13) Theresa told V.W. that she is a "black sinner;" and (14) Theresa screams at V.W. while she does her homework.

¶ 10    Dr. Goldstein noted in his report Theresa's responses to the concerns Patrick related to him. She stated that children can be carriers of salmonella and may have it for a period before it emerges. She also denied that V.W. was late to school more than 50 times, and she noted that V.W. was only late five or six times during the past school year. She also denied telling V.W. that Patrick was going to take her away or that she told V.W. to draw "bad pictures" of him, noting that the journal was given to her by her counselor. She also related that Rena took "naked pictures of [V.W.] in the bathtub, and that these were inappropriate," but she acknowledged that the Illinois Department of Children and Family Services (DCFS) concluded that the complaint was "unfounded." She also asserted that V.W. always had short hair and liked it that way, and V.W. had cut her own hair when she was five years old such that Theresa had to have it fixed. She denied knowing when Patrick's wedding was. She similarly denied knowing how many school uniforms Patrick had purchased for V.W., and she asserted that she always sent them with V.W. during Patrick's parenting time. She denied that Patrick purchased more than one pair of glasses for V.W., and asserted that she made sure that V.W. had an extra pair of glasses at school. Theresa related that she had no knowledge of V.W. going to school without adequate shoes, and the school had not contacted her regarding the same. She acknowledged that she would like to be closer to her parents out-of-state. Theresa also denied blaming V.W. for Privett moving out of her residence, and likewise denied calling V.W. a "black sinner." She clarified that V.W. has said that her father is "a black sinner" because he does not believe in God. She also denied yelling at V.W.

when she does her homework, but she acknowledged that V.W. has had academic trouble since kindergarten.

¶ 11    Dr. Goldstein noted in his report that Theresa delineated numerous concerns she had about Patrick during the evaluation, including: that (1) he wanted to take V.W. away from her; (2) he does not spend time with V.W., and Rena is the one who actually cares for her during his parenting time; (3) he is an atheist, has told V.W. that there is no God, and does not take V.W. to church even though she is religious; (4) he continues to interfere in Theresa's life; (5) he is unemployed and was involved in mining Bitcoin; (6) he did not pay his share of the insurance premium until court ordered to do so; (7) he disowned his entire family, and his family reaches out to Theresa to see V.W.; (8) he threatened to take V.W. out of her current school; (9) he opposes tutoring recommended by V.W's school; (10) he fails to communicate with her regarding V.W.'s schooling; (11) he did not communicate with her when V.W. was wheezing in gym class; (12) he had scheduled counseling appointments without telling her; (13) he failed to send V.W.'s psychological evaluation to her; (14) he did not seek medical attention for V.W. after she fell off her bicycle and had a concussion, and he told V.W. to not tell Theresa; (15) he does not provide adequate car safety for V.W.; (16) he is emotionally abusive toward V.W.; (17) he disparages her to V.W; (18) he refuses to allow V.W. to wear training bras; (19) Rena refused to pick up V.W. from school and made her wait for Patrick to pick her up; (20) he lies to V.W. by telling her that money is not real and that Bitcoin is real; (21) he tells V.W. that Theresa and Patrick's maternal aunt, Noell Dust, are liars; (22) he does not allow V.W. to have choices or pick out her own clothes; (23) V.W. does not clean her room at Theresa's home because she is not required to do so at Patrick's; and (24) he "exploded" at her when she took V.W. out of daycare after another child touched her.

¶ 12    Dr. Goldstein also detailed in his report his evaluation of V.W.  She was eight years old at the time of the evaluation, and "she displayed no overt signs of any significant emotional disorder." V.W. described Theresa as a "nice[,] [l]oving mom," who "takes us places like the Wisconsin Dells" and, at times, they have a day for just the two of them.  She stated that her mother is "[n]ot happy when [she] do[es] something wrong" [because she] "used to lie when [she] was little."  She indicated that Theresa spanks her or puts her in the corner when she becomes angry.  She spontaneously related that "dad doesn't spank or put me in the corner.  Sent to my room one time. He yelled."

¶ 13    V.W. described her father as "always funny [and] [n]ice," although he "[s]ometimes has a bad attitude—grumpy."  She stated that he yells when he becomes angry, and that he has slammed doors.  During a subsequent interview with Dr. Goldstein, V.W. "spontaneously related that she was scared of her father," and "she indicated that her father grabbed her collar when she didn't want to take her vitamins when she was four years old.  She also related that her father grabbed her by the arm when she was seven years old."  She reported that she did not think her father believes in God, but he had never questioned her belief.  Her mother believes in God, and she goes to church with her, but not her father.

¶ 14    V.W. denied that either parent made negative comments about the other to her, and it was her perception that her parents did not speak to each other.  V.W. reported that Patrick's house was cleaner than Theresa's, where the rooms were all "huge messy."  She also reported that her mother told her that she is a "black sinner," and she noted that she often lied, and it was still a problem for her.  Goldstein noted in his report that Theresa told  V.W. to make "bad pictures" of her father, but "that a counselor wanted her to make the pictures[,] as well."  She also related that Privett once disciplined his daughter, Mackenzie, by putting a jalapeno in her mouth while V.W. and Theresa

were present. V.W. also indicated that both parents often yell at her regarding homework. Dr. Goldstein also noted in his report that V.W. told him that Patrick "keeps secrets," and that her mother told her that her father wanted to "keep [her] forever." Dr. Goldstein further noted that V.W. stated she wanted to see both parents and it "would not be fair" because she loved both parents. Dr. Goldstein stated in his report that "[i]t would appear [Theresa] did attempt to coach [V.W.]. There is no evidence that [Patrick] attempted to coach her or that Rena attempted to coach her."

¶ 15    Dr. Goldstein administered the Bricklin Perceptual Scales to V.W., and she "rated her mother as the preferential parent on fourteen items, her father as the preferential parent on seven items[,] and the parents as equal on the remaining eleven items." His report also indicated that V.W. "perceived her father as stronger in follow-up consistency, while she perceived her mother as stronger in supportiveness. She perceived her parents as relatively equal in admirable character traits, while she perceived her mother as somewhat stronger in competency."

¶ 16    Dr. Goldstein observed each parent interact with V.W. She was "clearly comfortable with her father and clearly bonded and attached to him" and she likewise "appeared to [be] comfortable with her mother and bonded and attached to her."

¶ 17    At the conclusion of the report, Dr. Goldstein recommended that the parenting schedule be modified, stating that he "would strongly suggest that Patrick Williams have the majority of parenting time during the school week." Specifically, he recommended that Theresa have parenting time on alternating weekends, from Thursday after school until Monday morning, as well one evening per week, from after school until 7:30 p.m. He made clear that "[t]he rationale for the change in parenting time is that [Patrick] has greater flexibility in his work schedule and[,] as a result[,] is home and available, coupled with his and his current wife's ability to provide more

structure and stability for [V.W.]." Dr. Goldstein also noted his concern "about the reports of lack of cleanliness in [Theresa's] home, and *** her attempts to coach [V.W.] and the damage to [V.W.'s] self-esteem from some of her mother's comments to her."

¶ 18                                    The GAL's Report

¶ 19     The GAL also filed a report with the circuit court.[1]  The GAL met with and interviewed numerous people, including both parties, V.W., her current and former counselors, and her teacher. In evaluating the statutory factors pertaining to V.W.'s best interests for purposes of allocating parenting time, the GAL noted that V.W. "has expressed a desire to primarily reside with [Theresa].  However, it is the Guardian *ad Litem's* opinion that the minor has been pressured and influenced by [Theresa] to express this desire."  She also noted that both parents had performed caretaking functions for V.W., as Theresa "has taken the lead on medical, dental[,] and counseling appointments," and both parents were involved with V.W.'s schooling.  She noted that Patrick stated that he does not attend V.W.'s appointments "so as to avoid the inevitable conflict" with Theresa.  The GAL also noted that V.W. "is connected to and has a close relationship with both of her parents."  Concerning the parties' home environments, the GAL reported that they are "very different," in that Theresa "appears to struggle with cleanliness and organization."  The GAL also noted that V.W.'s bedroom at Theresa's house was cluttered and disorganized, and that "there was only a path to [her] unmade bed."  Patrick's house "was completely the opposite," as V.W.'s

---

[1] We are unable to determine when the GAL report was submitted, as the copy in the record is neither dated nor file stamped.  We note that the GAL's report specifically references Dr. Goldstein's September 10, 2018, Child Custody Evaluation, and we presume that it was filed sometime after that.

bedroom was neat and organized, and everything had a place. The GAL stated her opinion that "[Patrick's] home provides the structure and stability [V.W.] requires to reduce her anxiety and nervousness." She noted that Patrick and Theresa do not cooperate well in managing [V.W.'s] schedule. She likewise stated her belief that "[Theresa] has a need for power and control over [V.W.] and over [Patrick], and that she has "manipulated the minor to do things and say things which have enabled [Theresa] to maintain power and control." The report went on to state that Theresa "has attempted to manipulate and pressure most, if not all of the professionals in this matter by providing slightly misleading information and mischaracterizing situations and events.

¶ 20    The GAL's report ultimately recommended that Patrick be allocated a majority of parenting time during the school year. Specifically, she recommended that Theresa have parenting time every other weekend from Thursday at 5:00 p.m. until Sunday at 5:00 p.m. and one weeknight from after school until 7:30 p.m., with Patrick having all other parenting time. During summer vacation from school, the GAL recommended that Theresa and Patrick each receive 3 weeks of uninterrupted parenting.

¶ 21                    The Hearing

¶ 22    Between February and June 2019, the circuit court conducted an 11-day hearing on Patrick's motion to modify parenting time. Numerous witnesses testified, but we recount only the testimony that is necessary for resolving this appeal.

¶ 23                    *Theresa*

¶ 24    Theresa testified that she was V.W.'s mother, who was 9 years old at the time of the hearing. V.W. primarily resided with her in her home. Elliott, her son with Jason Privett, also lived in her home. Elliott was V.W.'s half-brother. Privett lived in her residence from 2013 until late 2015. Theresa testified that, although Privett was referred to as her fiancé in some of the

reports and pleadings, they were never engaged. Privett also had a daughter, Mackenzie, from a prior relationship. Mackenzie never lived in Theresa's home, but she had visited and spent the night when Privett lived there.

¶ 25    Theresa testified that she disagreed with the recommendations of the GAL and Dr. Goldstein that Patrick be provided the majority of the parenting time during the school year. She denied calling V.W. a "black sinner" or telling her that she had a "black heart." She was unsure where V.W. had heard those terms, but she assumed they talked about "sinning and lying and the nature of hearts" at V.W.'s catholic school. She also did not tell V.W. to draw "bad pictures" of Patrick in her journal, because she had nothing to do with the journal beyond reminding V.W. to bring it with her to counseling.

¶ 26    Theresa further testified that she did not attempt to coach V.W., and she disagreed with Dr. Goldstein's conclusion that there was no evidence Patrick had tried to coach her, stating that she had heard audio recordings where he "leads [V.W] in a roundabout way to say what he wants her to say," such as that Theresa was a bad mother, that V.W. wanted to live with Patrick, and that V.W. wished Rena was her mother. She did not have copies of the recordings, however, because Patrick did not give them to her.

¶ 27    Concerning the photos of V.W. that she believed were not appropriate, Theresa testified that Patrick gave V.W. his old cell phone, and V.W. brought it with to her appointment with her then-counselor, Renita Shores-Gaston. V.W. showed Shores-Gaston the phone, which included photographs of V.W. in a bathtub that were taken when she was 4 or 5 years old. Theresa testified that she did not tell V.W. to bring the phone with to her to the counseling appointment. Theresa did not believe the photos were pornographic, but she acknowledged that she told the GAL that she "did not like them" and thought they were "inappropriate." Shores-Gaston reported the photos

to DCFS, and Theresa eventually learned from DCFS that the case was unfounded. Theresa was not aware that a DCFS caseworker indicated that V.W. did not know about the photos until Theresa told her about them. She also did not recall a police officer telling her that she did not have a case regarding the photographs, but he told her that she "should go for an order of protection."

¶ 28 Concerning V.W.'s schooling, Theresa acknowledged that she had been late to kindergarten 26 times, but she stated that Patrick was responsible for four or five of those instances. She had no reason to doubt that V.W. was late to first grade 26 times, and she acknowledged that V.W. was late to second grade five times. She agreed that she told Dr. Goldstein that she previously had trouble being punctual, and she acknowledged that, previously, she often dropped off V.W. at school either late or very early. Theresa further testified that, at one point, she contacted V.W.'s teacher to express concern that Patrick was doing her homework for her. She also recalled expressing this concern to the GAL, yet she acknowledged that the GAL spoke with V.W's teacher, who did not believe that Patrick was doing V.W.'s homework for her.

¶ 29 Theresa agreed with the GAL's report that areas of her home were cluttered and unorganized when the GAL visited, especially the back porch and V.W's room. She denied that V.W.'s bedroom was messy at the time of the hearing, though. Theresa acknowledged that she and both of her children caught salmonella in the past, but she did not know how they got it. She also acknowledged that V.W. was diagnosed with hand, foot, and mouth disease in June 2016. She stressed, however, that half of her son's preschool "was out with hand, foot, and mouth," there was a sign posted on the preschool door to that effect, and her son was not the first child at the preschool to get it. Theresa also testified that she had pets in her home when the GAL visited, and she agreed with the GAL's report that her home had no pet urine or feces throughout it.

¶ 30    Theresa identified during cross-examination several photographs of her daughter wearing pajama-bottom shorts on days she left Theresa's house for Patrick's house during the wintertime, including on days when the outside temperature was below freezing. She testified that V.W. would often wake up and state that she would get dressed at Patrick's house. She pointed out that V.W. had to go "less than 10 feet out to Patrick's car, which was already warm," and she was wearing a jacket, mittens, shoes, and socks in the photos. Theresa added that Patrick would often send her back to Theresa's house wearing those same clothes.

¶ 31    Concerning V.W.'s hair, Theresa agreed that up until June 2017, it was either long or shoulder length, and she agreed that just prior to Patrick's wedding, it was cut "extremely short." She testified that the timing of V.W.'s hair cut was a coincidence because she did not know when Patrick's wedding was, and V.W. was permitted to pick her own hairstyle.

¶ 32    Theresa also testified to an incident in 2017 when V.W. was at Patrick's house and "was unsupervised [while] not wearing a helmet and fell off her bike." She stated that V.W. reported having headaches to her father, as well as reported headaches and white vision spots to Theresa when she returned to Theresa's home following the weekend. Theresa testified that she scheduled a doctor's appointment for V.W., but she "got pushback from [Patrick] saying 'you're going to look like a fool, why are we taking her in now?' " Patrick accompanied them to the appointment, and V.W. was diagnosed with a concussion. At the appointment, V.W. told Patrick that she was not supposed to tell Theresa about the fall. She further testified that, after V.W.'s fall but before the concussion diagnosis, Patrick took V.W. to play in an inflatable bounce house.

¶ 33                                 *Patrick*

¶ 34    Patrick testified that he was V.W.'s father and Theresa's ex-husband. He was currently self-employed trading and mining cryptocurrencies. He formerly operated his cryptocurrency

mining computers out of a rented warehouse, but he had since moved them to his garage and had not yet hooked them back up because profitability was down. He testified that he had been a house husband for the past several months.

¶ 35    Patrick testified that he had a great relationship with V.W., who resided with him six out of every 14 days according to the current parenting schedule. He testified he had not discussed the case with V.W., and he denied coaching her. He also denied telling V.W. that Theresa was trying to take her away from him or that he was trying to take her away from Theresa.

¶ 36    In disciplining V.W., Patrick testified that he uses "communication, negotiation, and compromise," and he denied ever striking or spanking V.W. He also testified concerning the incident V.W. described to Dr. Goldstein, wherein he grabbed V.W. by the collar when she was 4 or 5 years old. He testified that V.W. once stood up and screamed in his face because she did not want to take a certain flavor of children's vitamin. Patrick testified that he grabbed the suspenders of the school uniform she was wearing, and she fell on the couch and cried for a few minutes. After that, they apologized to each other and "everything was fine."

¶ 37    Patrick testified that, in March 2018, he observed V.W. sitting by a window crying, and she told him that her mother said that she will never have a happy childhood and would "never be a normal child because of all the crazy things your dad has done to you." Several times during the spring of 2018, V.W. told him that her mother had called her a liar.

¶ 38    Patrick also testified that V.W. brought a journal to his house filled with V.W.'s drawings. He identified as an exhibit several such drawings. One depicted a girl crying under a cloud and the word "dad" was written in below it. Another drawing had a "bald guy with a mean face and a child," and the words "you lied" was written in V.W.'s handwriting on the picture. Other than

what Dr. Goldstein concluded in his report, he had no evidence that Theresa instructed V.W. to draw "bad pictures" of him in her journal.

¶ 39    Patrick also detailed an incident wherein Theresa wanted to switch one of her scheduled days with V.W., and Patrick suggested trading a particular day so that he could take V.W. to the father/daughter dance at her school. Theresa initially refused to trade the day of the dance, and Patrick learned that Privett was planning to take her. Theresa eventually agreed to let Patrick take V.W. to the dance, but she stated that V.W. would have to tell Privett that he could not take her. Patrick ultimately told Privett, however, because he thought requiring V.W. to tell him would have put "a tremendous amount of pressure" on her.

¶ 40    Patrick also testified at length regarding V.W.'s schooling. He stated that, between kindergarten and second grade, Theresa brought V.W. to school late over 50 times. He acknowledged that V.W. was late far less often since he had filed his motion to modify the allocation of parenting time. Patrick testified that V.W. was never late to school when he drove her, and he asserted that she had spent the night at Theresa's house immediately before the days on which Theresa testified that he had dropped her off at school late. He further testified that his schedule was flexible and allowed him to drop off and pick up V.W. every day at school, as well as allowed him to go in to see her teacher and to wave to her principal every day.

¶ 41    Patrick continued that he helps V.W. study and do homework using a dry erase board in his basement. They would "play teacher" and find ways to make learning interesting "because usually there's a lot to do by the time [V.W.] makes it to [his] house." Patrick tried to challenge V.W. in her reading "because she needs help," and they read books from the third-grade level to the fifth-grade level. He stated that, at her mother's house, V.W. read books that were not as challenging. He also stated that Theresa would only complete "easy" homework with V.W., and

she would leave "anything that requires work, like math problems, word problems, that kind of thing," for him to work on with V.W. during his parenting time. There were also several instances when Patrick was unable to retrieve V.W.'s "homework packets," "study guides, homework, [and] stuff for school." He was frustrated because he felt Theresa was not doing enough of the homework packets with V.W. during her parenting time. He conceded, however, that he never spoke to Theresa about her handling of the homework packets or his complaint that she only assisted V.W. with easy homework. Patrick also disapproved of times when V.W. would turn in homework early that Theresa had completed with her, because he "wanted to lay [his] eyes on the work before it was turned in under [his] name, so to speak." He was concerned that it would reflect poorly on him if V.W. "did terrible" on a homework assignment that was due immediately following his parenting time but was completed with Theresa and turned in early. Patrick conceded that he did not raise these concerns with Theresa. Patrick was not opposed to V.W. having a tutor, but he felt that it should not be a replacement for good parenting. He testified that he could not recall speaking with V.W.'s second grade teacher about her needing a tutor.

¶ 42     Patrick also testified that he often had difficulty getting V.W.'s school uniforms back from Theresa, but he acknowledged that Theresa had similarly accused him of not returning school uniforms. He also testified as to a group exhibit of photographs he took of the "remainders of [V.W.'s] lunches" that Theresa had packed for her during second grade. He testified that he "simply took the pictures and sent them to [his] wife," Rena, "in annoyance." He acknowledged that he never communicated with Theresa regarding the nutritional quality of the lunches she packed for V.W.

¶ 43     Patrick testified that V.W.'s hair was shoulder length or longer prior to his wedding in June 2017. He testified that V.W.'s hair was cut "aggressively short" five days before his wedding, and

he had previously told Theresa when his wedding was. He and Theresa had conversation via text message in 2014 concerning how V.W.'s hair should be cut, and they agreed to discuss any major changes to V.W.'s hairstyle before cutting it. When V.W. draws herself, she always draws herself with long hair.

¶ 44    Patrick also testified as to several incidents with Theresa involving the police. In September 2015, Theresa sent the police to his home for a wellness check after he did not return her text messages for approximately 40 minutes when V.W. was at his house and not feeling well. He testified that he put his phone on silent because V.W. was sleeping. When the police arrived, he showed the officer the text message argument he was having with Theresa, and the police left his house. In June 2017, the police contacted him regarding the photos of V.W. from his old cell phone that Shores-Gaston reported to DCFS. He testified that no charges were filed and the DCFS investigation was "unfounded." Theresa had also filed a petition for an order of protection based upon the photos, but she later dismissed it.

¶ 45    Patrick further testified that V.W. was often dressed inappropriately during the winter "transition days" between the two households. When he would pick her up from Theresa's house, V.W. sometimes wore pajama shorts with no socks, a short nightgown, and a winter coat. He began to pack clothes for her in his car in case they were in an accident or had some emergency while driving. He testified that V.W. is always dressed appropriately for the weather when he returns her to Theresa's house.

¶ 46    Patrick acknowledged that he had recorded various conversations with V.W. without her knowledge, but he testified that they have "normal conversations" about things such as her clothes, coat, or homework, or whatever else V.W. would bring up. He denied recording her every time they were together, and he could not recall the last time he recorded her.

¶ 47                                    *Renita Shores-Gaston*

¶ 48      Renita Shores-Gaston testified that she was a licensed clinical social worker, and she had provided weekly counseling services for V.W. from approximately March 2017 until January 2018. She initially met with Theresa to learn her concerns and develop a plan for counseling V.W. Her initial assessment of V.W. was that she had "adjustment disorder with anxiety." She explained that the disorder manifested as a difficulty in making transitions and adjustments, and that V.W. was also "very anxious and worried about different incidents in her life." As their sessions continued, V.W. opened up to her "at times," but there were also "times where she would be closed off." They talked about being able to identify her feelings, because V.W. "would have difficulty, at times, being able to identify what she was feeling or being able to talk about what she was feeling." There were also times when V.W. was upset with either parent or their partners.

¶ 49      During their sessions, Shores-Gaston became "really concerned" about two things that V.W. told her. Specifically, V.W. reported that her father told her that she was going to have to see a judge and talk about where she wanted to live, and that her mother was going to go to jail. She was also concerned when V.W. told her about a dream she had where her father was "going to kill" her mother.

¶ 50      Shores-Gaston testified that she gave V.W. a journal and "encouraged her to draw pictures of how she's feeling" and then bring it with her to counseling. Whether or not V.W. wanted to share it with her was fine, and she provided every child she counseled with a journal. She told Theresa about the journal after she gave it to V.W., and she never discussed the journal with Theresa after that. There were many times V.W. brought the journal to counseling but would not share it with her. V.W. never told her that she was directed by anyone to draw a picture in it a

certain way, and Shores-Gaston was not aware that V.W. reported to Dr. Goldstein that her mother told her to draw negative images of her father in it.

¶ 51    Although her assessment of V.W. did not change over the course she counseled her, Shores-Gaston recommended that V.W. be evaluated by a psychiatrist because V.W. told her she was hearing voices. She eventually stopped counseling V.W. because "she was receiving services from several *** different places, so [she] thought it'd be best to [stop] and let her get services at those [places]," and because she thought V.W. needed someone with more expertise.

¶ 52                        *Faith Mattison*

¶ 53    Faith Mattison testified that she had been V.W.'s psychotherapist since the spring of 2018. She had practiced psychotherapy for 20 years, and her clients were exclusively children and adolescents. Theresa and Patrick bought V.W. to the initial counseling appointment, and it was "rather odd." Theresa was "fairly high strung" and requested to not sit in the waiting room with Patrick, and Patrick moved his chair into the hallway to watch the door to her office "to make sure that people weren't going out when [she] was speaking with [V.W.]." Patrick also seemed "untrustworthy of [her] and the [psychotherapist] position," and he tried to give her his "notebook of evidence." She refused to accept the notebook and explained to him that it was "not [her] role."

¶ 54    Her initial assessment of V.W. was based on a prior report where V.W. was diagnosed with "generalized anxiety disorder and sensory processing disorder." She was required to give a diagnosis during the first session, so she "took the diagnosis from the other doctor," likely Dr. Dan Griffith, just prior to beginning therapy with her. Her initial impression of V.W. was that she was in a "really difficult family situation and that was causing a lot of the anxiety that she was having." When she counsels children facing similar family challenges, she focuses on helping the child build coping skills to enable them to negotiate each parent's household. In V.W.'s case, "the

structure and the rules are different [at each parent's house]," and so they frequently discussed how to negotiate those two settings. In developing coping skills, they talked about the points in time where V.W. could "regroup herself and remember which house she's going to and what helps her the best at each house." She explained that V.W.'s sensory processing disorder makes it more difficult for her to make sense of the world around her. She further explained that children use their environment and their senses to understand the world around them, and because V.W. has trouble processing those things, she "also has trouble processing different things from different people."

¶ 55    Mattison testified that, initially, V.W. was not forthcoming with her during therapy because she is "very good at avoiding and deflecting and [has] a lot of other behaviors that make therapy difficult." In the beginning, V.W. "was trying to figure out whether she could trust [Mattison]," and "whether or not [she] was going to pick sides." V.W. told her lots of things early on that she did not believe were truthful, and so she did not put a lot of weight in those things until V.W. began to trust her and knew that they had a safe place to talk.

¶ 56    Eventually, V.W. began to disclose more to her, and Mattison "had to establish a rule about what is the truth and what is a lie *** because of the situation that she's in and her age." Every time V.W. meets with her at her office, they have an agreement that V.W. will tell the truth. Once V.W. understood the difference between the truth and a lie, V.W. confided that a lot of things she had said previously were not truthful. She believed that some of the untruthful things V.W. told her "may have been things that she had overheard or that she felt would make one or the other of her parents happy with her." V.W. told her, for example, that she was untruthful when she said that her father would do her homework for her, or that her mother had called her names. When they discussed things that V.W. told others that were not truthful, she allowed V.W. to lead the

conversation because she did not want to insert ideas into her head. She believed that V.W. embellished things to make one parent or the other happy. Mattison tried to teach her "that you can't tell stories that are bigger than what they truly are," and "sometimes it's not always pleasant to tell the complete truth, but sometimes you have to." It was her opinion that V.W. made disclosures to others that were not truthful to gain favor with her parents. Mattison was certain that V.W. knew that her parents did not get along, and it was her opinion that V.W. tells her parents what she thinks they want to hear and does the things she thinks they want her to do. Mattison believed V.W. was truthful when she told her that her father "took ahold of her collar," because she was "adamant about [it]." She also was truthful when she said that she felt that her father gets impatient with her when they work on homework together. She also felt that V.W. was truthful about the disorganization at her mother's house, and she later advised Theresa that V.W. needed more structure, which Theresa seemed receptive to.

¶ 57    V.W. also told her that her mother had called her a liar, and Mattison counseled Theresa on other ways to approach with V.W. the issue of truth telling. Theresa was likewise receptive to this advice. Mattison further testified that she asked V.W. about the allegation that her mother told her that she had a "black heart," but she stated that she did not remember it. Mattison was unsure if V.W. truly did not remember it or if she was simply unwilling to talk about it. She also testified that V.W. was aware that her father had recorded conversations with her, and they had discussed it early on in therapy. V.W. reported that she was worried about the recordings but, together, they concluded that V.W. should not "really worry about those things." Mattison stated that V.W. "was worried about a lot of adult things in the beginning."

¶ 58    Mattison further testified that V.W. told her "numerous times that she would like to continue living with [Theresa], and she felt like Patrick "has too many rules and that he *** gets

upset with her sometimes when she does homework." Mattison testified that V.W's preference on where she wanted to live did not waiver during her counseling. Mattison was unsure whether anyone had attempted to coach V.W. to say things about one parent or the other, but she testified that she thought "[V.W.] has overheard things. That she believes certain things," but that she did not know where those ideas came from. She indicated that, after she spoke with both parents about it, V.W. said nothing further about the court proceedings during their sessions. Mattison believed that Patrick and Theresa both want the same thing—for V.W. to be happy.

¶ 59    In her professional assessment, "the 50/50 placement would be best for [V.W.]" in terms of a parenting schedule. Her biggest concern was "mom and dad not being able to communicate with one another or to get along with one another or to agree on ***any type of parenting style."

¶ 60                                                    *Noell Dust*

¶ 61    Dust testified that she was Patrick's maternal aunt. Prior to Patrick's divorce, she had a close relationship with him, and they spent a lot of time together. She used to go to Theresa and Patrick's house two or three times per week, and she cared for V.W. while they were at work. During the initial divorce proceedings, Dust was contacted by the GAL, and she told her that she thought V.W. should reside primarily with Theresa. The GAL summarized their conversation in her report and, after the report was filed, Dust and Patrick never spoke again.

¶ 62    After the divorce was finalized, Dust continued to care for and spend time with V.W one day per week as "a way of keeping [her] relationship strong with her." On days she currently cares for her, she picks V.W. up from school and brings her to Dust's home, where V.W. does her homework, eats dinner, and plays games with her. Dust usually brings V.W. back to Theresa's home at 7:00 p.m. Dust further testified that, every few months, she takes V.W. to visit with extended family, such as V.W.'s great aunt and great uncle. To her knowledge, Patrick did not

bring V.W. to see his side of the family. Dust testified that she is "very, very close" to V.W., who is "like a granddaughter to [her]."

¶ 63    Dust further testified that, in late September 2018, she picked up V.W. from school and V.W. began to cry, and her hands and legs shook as they sat in her car in the school parking lot. Dust asked her what was wrong, and V.W. said that "a lady named Kim [the GAL] told her dad it would be better if she lived with her dad all the time." Dust tried to calm her, and V.W. told her that if she lives with her father, he would take her out of her school, she would not have any friends, and he would not take her to church because he does not believe in God. Dust testified that she called the GAL the next day and relayed what V.W. told her. The GAL sounded angry on the call, and she asked Dust who had said those things to V.W. Dust reported that V.W. stated she learned this information from Patrick.

¶ 64                       The Circuit Court's Ruling

¶ 65    On August 28, 2019, the circuit court announced its decision orally, and it filed a 16-page, single-spaced memorandum of decision detailing its findings the following day, on August 29, 2019. We recount only the findings necessary to an understanding of the circuit court's reasoning for modifying the allocation of parenting time in view of the issues Patrick raises on appeal.

¶ 66    In finding there was a substantial change in circumstances necessitating modification of the parenting plan, the court found that there were "significant instances where both parents have engaged in conduct that has caused a change in circumstances that has adversely affected [V.W.'s] best interests." Despite finding both parents were responsible for the change in circumstances, the court went on to state that "in order *** to find that a change in circumstances requiring a modification of the parenting order has occurred, it is necessary *** to make a finding that

Theresa's conduct has caused a change in circumstances that necessitates a modification of the allocation of parental responsibilities in [V.W.'s] best interests. I make this finding."

¶ 67 In support of its finding of a substantial change in circumstances, the circuit court began by noting that V.W. was diagnosed by various mental health professionals with sensory processing disorder, adjustment disorder with anxiety, and general anxiety disorder. It relied on Mattison's testimony that V.W.'s general anxiety disorder was caused by her "difficult family situation," and the court made clear its view that both parents bore responsibility for the family conflict. The court detailed several instances in which each parent caused V.W. emotional distress. For example, it noted the incident where Theresa sought an order of protection against Patrick stemming from the photos taken by Rena of V.W. while she was in a bathtub. The court found that Theresa facilitated V.W.'s disclosure of the photos to Shores-Gaston, because she wanted them reported to DCFS. It noted that DCFS concluded the allegations were unfounded, and that Theresa dismissed the petition for an order of protection after DCFS and the police determined the photos were not inappropriate. The court found Theresa's belief that the photos were inappropriate was unreasonable, and concluded that the request for an order of protection caused Patrick and V.W. emotional distress, as well as interfered with Rena's ability to develop a relationship with V.W. In the court's view, "[t]his contributed to the difficult family situation referred to by Faith Mattison." The court also noted that Theresa called the police on Patrick for a frivolous reason in 2015 (albeit "Patrick contributed to the circumstances in which the police were called" by muting his phone at a time he knew Theresa was worried about V.W. because she was ill), interfered with his father/daughter dance parenting time in 2018, and unduly delayed his ability to adjust the parenting schedule to take V.W. to the dance in 2019—all of which contributed to the "difficult

family situation." The court also noted that Theresa's home was disorganized and messy, which contributed to V.W.'s anxiety.

¶ 68    The court similarly detailed instances where it found Patrick's behavior contributed to the difficult family situation that caused V.W.'s anxiety. It noted that Patrick actively tried to disrupt the relationship between Theresa and Privett by contacting Privett's former paramour to assist her in obtaining custody of Mackenzie, as well as contacted Privett to offer to help him get custody of Elliot, whom Privett shared in common with Theresa. The court found these actions fostered anxiety and mistrust toward Patrick by Theresa and thus contributed to V.W.'s difficult family situation. It also found that Patrick demonstrated "questionable judgment" when he allowed V.W. to go into an inflatable bounce house pending a doctor's appointment for concussion-like symptoms after she fell off her bicycle. This decision "caused anxiety to Theresa by exacerbating her concern over [V.W.'s] health and contributed to the difficult family situation." The court opined that if the roles had been reversed, Patrick would likely have alleged medical neglect by Theresa. It also noted that Patrick caused emotional distress to Theresa and worsened the family conflict by frivolously alleging that Theresa was negligent in letting V.W. go from Theresa's house to Patrick's car in the winter while dressed in "skimpy sleepwear with only a warm coat." Finally, it noted that Patrick filed an ARDC complaint against Theresa's former attorney which, according to Theresa, caused her former attorney to withdraw.

¶ 69    The court made clear that it found "significant instances where both parents have engaged in conduct that has *** adversely affected [V.W.'s] best interests." Indeed, the court was explicit that the conduct of both Theresa and Patrick contributed V.W.'s difficult family situation, which adversely affected her emotional well-being and manifested as general anxiety disorder.

¶ 70   The circuit court also detailed instances where it made findings directly at odds with the allegations Patrick set forth in his motion to modify the allocation of parenting time.  Specifically, it found that: (1) there was no factual basis to conclude that V.W. contracted either salmonella or hand, foot, and mouth disease due to unsanitary conditions in Theresa's home; (2) Theresa did not originate the statement that Patrick had a "black heart;" (3) Theresa was not negligent in allowing V.W. to go to Patrick's car in the winter while wearing only sleepwear and a coat, and it found the allegation frivolous such that it caused Theresa emotional distress and contributed to the "difficult family situation" referenced by Mattison; (4) Theresa had not neglected V.W.'s schooling, as she was "appropriately serving [V.W.'s] educational needs; (5) there was insufficient evidence that Theresa had neglected V.W.'s nutrition regarding her school lunches; (6) Theresa did not intentionally cut V.W.'s hair before Patrick's wedding, as there was contradictory evidence concerning whether she knew when the wedding was; and (7) Theresa did not tell V.W. to draw negative pictures of Patrick in her journal, because Shores-Gaston instructed her to use the journal to express her feelings.

¶ 71   After finding a substantial change in circumstances, the circuit court analyzed the statutory factors set forth in section 602.7(b) of the Marriage Act (750 ILCS 6/602.7(b) (West 2018)) to evaluate how to serve V.W.'s best interests in allocating parenting time.  It found that factors 1 through 8 and 11 through 14 were relevant, and it made explicit findings for each.

¶ 72   Factor 1, the wishes of each parent seeking parenting time, was neutral, because both parents wished to have most of the parenting time.  Factor 2, the wishes of the child, was also neutral.  The circuit court indicated that it did not ask V.W. to express a preference as to parenting time, and she did not indicate a preference of one parent over the other.

¶ 73    Factor 3, the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities, slightly favored Theresa. Although the court found that both parents were involved in caring for her during the prior two years, it noted that Theresa was the primary parent regarding her teachers, counselors, health care providers, and tutor. It explicitly did not find compelling Patrick's excuse that he deferred to Theresa regarding attendance at medical and counseling appointments to avoid conflict, as there was no evidence of any past conflict at such appointments. Instead, it found that Patrick simply deferred to Theresa in these areas.

¶ 74    Factor 4, any prior agreement or course of conduct between the parents relating to caretaking functions with respect to the child, favored neither party, as they both followed the parenting schedule established in the original custody judgment and had agreed to modifications from time to time.

¶ 75    Factor 5, the interaction and interrelationship of the child with his or her parents and siblings and with any other person who may significantly affect the child's best interests, favored neither party. The circuit court noted that V.W. had a good relationship with both parents, despite her conflicting statements about them. It noted that there was no evidence that she was alienated from her father, despite Patrick's allegation that Theresa had engaged in alienating-type behaviors. It also found that Rena was a devoted stepparent to V.W., who provided appropriate care for her and understood her role as a stepparent. The court noted that Privett had both positive and negative qualities, but he had improperly discipled Mackenzie and Elliot. It concluded that, nevertheless, he posed no threat to V.W. The court also recognized V.W.'s close relationship with Dust, and it noted that Patrick was estranged from her because she told the GAL that she thought V.W. should

primarily live with Theresa. The court noted that Patrick maintained no relationships with local relatives, yet V.W. had a close and positive relationships with many og them.

¶ 76    Factor 6, the child's adjustment to his or her home, school, and community, slightly favored Patrick. Although the circuit court noted that V.W. was adjusted to both homes, it found that she "is more comfortable and has less anxiety in Patrick's home environment because it is neat and organized[,] while Theresa's home is cluttered and disorganized." V.W. was also close with Rena, but had problems with Privett because of his discipline techniques with his own children. It noted that V.W. was close with her half-brother, Elliott. Concerning her education, the court commented that V.W. was well-adjusted to her school and was on the honor roll. It noted that Theresa was more involved than Patrick with V.W.'s teachers and tutor. It further noted that Theresa obtained a tutor for V.W. at her teacher's recommendation, and Patrick was not involved with the tutor. However, Theresa was responsible for causing V.W. to be late to school, particularly during kindergarten, although the problem was now largely resolved. The court commented that both parents were involved with V.W.'s homework, but Patrick was more involved and read to V.W. at a more advanced level.

¶ 77    Factor 7, the mental and physical health of all individuals involved, was neutral. The court noted that Dr. Goldstein's evaluation of each parent revealed no mental health problems. It noted that V.W. was diagnosed with adjustment disorder with anxiety, general anxiety disorder, and a sensory processing disorder.

¶ 78    Factor 8, the child's needs, was neutral because it found V.W. "needs a parenting allocation plan that provides for stability and minimizes conflicts between her parents," as well as needed "frequent contact with both parents."

¶ 79 Factors 9 and 10 were not applicable, as the distance between the parties' homes did not impact the court's decision, and it also found that a restriction on parenting time was not appropriate.

¶ 80 Factor 11, the physical violence or threat of physical violence by the child's parent directed against the child or other member of the child's household; favored neither party, as there was no evidence of physical violence or threat of physical violence against V.W. by either parent.

¶ 81 Factor 12, the willingness and ability of each parent to place the needs of the child ahead of his or her own needs, favored neither party. The circuit court stated that "neither parent shows consistent willingness nor ability to place [V.W.'s] needs ahead of his or her needs in important respects." Concerning Theresa, the court noted that she was either "unable or unwilling to keep her home free from clutter and organized sufficiently to provide the structure [V.W.] needs. She also was not able to maintain a schedule to ensure V.W. is consistently on-time for school. Concerning Patrick, the court found that he was "unwilling to put aside his aversion to communicate with Theresa *** even when it is necessary for [V.W.'s] best interests." It noted that he was no longer self-employed, but was a house husband, and that Rena indicated that the custody case had "consumed Patrick's life." Patrick had recorded conversations with V.W., and that fact demonstrated to the court "how all-consuming Patrick's mission to obtain custody has become." It noted that Patrick "focused on the micro-details of Theresa's life to find evidence of bad parenting." It also noted that, rather than contact V.W.'s teachers when he was concerned that she was not receiving healthy lunches from Theresa, he instead focused on "how this might help his litigation." The court stated that this demonstrated his unwillingness to put V.W.'s needs ahead of his own.

¶ 82    Factors 13 and 14, the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child, and the occurrence of abuse against the child or other member of the child's household, respectively, favored Patrick. Addressing factor 13, the court noted that Theresa had "engaged in problematic conduct" in her willingness and ability to facilitate and encourage a close and continuing relationship between Patrick and V.W. It noted, as an example, her efforts to undermine Patrick's ability to attend the father/daughter dance, and her initial request that Patrick's visitation with V.W. be supervised, as noted by Dr. Goldstein. Concerning factor 14, the court noted that there was evidence from Theresa's testimony that Privett had used inappropriate discipline with his children, which made V.W. anxious

¶ 83    The circuit court also outlined in its written ruling the reports and recommendations of the GAL and Dr. Goldstein. It disagreed with their ultimate recommendations, both of which recommended that Patrick receive the majority of parenting time, because it found that each utilized a flawed analysis. The circuit court explicitly noted numerous areas of disagreement with the recommendations.

¶ 84    In the court's view, Mattison best assessed the family dynamics and V.W.'s best interests. It observed that Mattison had regularly counseled V.W. since the spring of 2018, and she had also met with both Theresa and Patrick. It stated that Mattison's testimony represented "a frank assessment of the positive and negative attributes of both parents." It was also convinced by Mattison's "reasoned explanation" for V.W.'s inconsistent and contradictory statements, and it noted that Mattison heard V.W. make positive and negative statements about both parents. The court was also explicitly persuaded by the insight she provided concerning the behaviors of both parents and "how the actions of both parents contributed to the 'difficult family situation' that

caused [V.W.'s] anxiety." Mattison "recognized the positive attributes that Patrick's more structured home would provide to [V.W.], but also recognized that Theresa needed to maintain parenting time with [V.W.] because of [V.W.'s] attachment to her mother." It noted that Mattison opined that an equal parenting schedule was in V.W.'s best interests.

¶ 85    The circuit court modified the parenting plan to provide for equal parenting time between the parties. Although it found that it was in V.W.'s best interests to modify the parenting order, the circuit court made plain its view that "the modification does not need to be a wholesale shifting of parenting time from one parent to the other," Specifically, the order provided that "in week one, Patrick will have parenting time with [V.W.] from Wednesday after school, or 5:00 p.m. when school is not in session, until Monday after school, or 5:00 p.m. when school is not in session; [I]n week two[,] Patrick will have parenting time with [V.W.] from Wednesday after school, or 5:00 p.m. when school is not in session, until Friday after school, or 5:00 p.m. when school is not in session. Theresa will have parenting time at all other times." In issuing its ruling, the circuit court stressed that it found that Theresa and Patrick had "engaged in both positive and negative parenting toward "V.W," and that "the parental conflict itself has been the cause of much of [V.W.'s] anxiety," and "both parents bear responsibility for this conflict." The court was persuaded that V.W. needed and loved both of her parents, and that she was adjusted to both of their homes. In so ruling, the court expressed its hope that the modified parenting plan would "put an end to the ongoing parental conflict" such that "both parents will act in [V.W.'s] best interests in the future." Patrick timely appealed.

¶ 86                                      II.  ANALYSIS

¶ 87    On appeal, Patrick argues that the circuit court erred in dividing the parenting time equally between the parties rather than allocating to him the majority of parenting time. Specifically, he

contends that the court erred in (1) declining to follow the recommendations of the GAL and Dr. Goldstein that he be allocated the majority of parenting time; (2) engaging in a "tortured and flawed analysis," justifying "Theresa's attempts of alienation by inappropriately shifting blame to Patrick," despite the "deeply concerning" factual determinations about Theresa; and (3) largely denying his motion *in limine* that sought to bar certain witnesses and exhibits due to their disclosure "on the eve of trial." For her part, Theresa argues that the order modifying the parenting plan was not against the manifest weight of the evidence because the circuit court was permitted to rely on Mattison's testimony, and it reasonably analyzed the evidence to apportion blame between the parties for causing and/or contributing to V.W.'s anxiety. Moreover, she asserts that the circuit court was within its discretion in denying in part Patrick's motion *in limine*.[2] We address each of the issues identified by Patrick in turn.

---

[2] We note that portions of Theresa's brief fail to adequately cite the record for numerous factual assertions in contravention of Illinois Supreme Court Rule 341(h)(7) (eff. May 25, 2018), which requires that the argument section of an appellate brief include "citation of the authorities and the pages of the record relied on." Nevertheless, our review is not hindered because we have the benefit of Patrick's well-cited brief. We therefore decline his request to strike large portions of Theresa's brief. However, we will we disregard as needed the inappropriate content, and we caution appellate counsel that future violations may result in the appellate court striking her brief in its entirety.

¶ 88      Section 610.5(c) of the Marriage Act (750 ILCS 5/610.5(c) (West 2018)) governs modifications to a plan or judgment allocating parental decision-making responsibilities and parenting time.  It provides, pertinently:

> "[T]he court shall modify a parenting plan or allocation judgment when necessary to serve the child's best interests if the court finds, by a preponderance of the evidence, that on the basis of facts that have arisen since the entry of the existing parenting plan or allocation judgment or were not anticipated therein, a substantial change has occurred in the circumstances of the child or of either parent and that a modification is necessary to serve the child's best interests."  750 ILCS 5/610.5(c) (West 2018).

Thus, this section contemplates a two-step process to modify a parenting plan or allocation judgment.  First, the movant must demonstrate by a preponderance of the evidence that a substantial change has occurred since the entry of the existing parenting plan or allocation judgment.  *Id*.  This step serves to promote continuity in parenting plans, which the appellate court has long favored.  See *In re Marriage of Wycoff*, 266 Ill. App. 3d 408, 409-10 (1994).  If the movant fails to meet his or her burden, the court must deny the request to modify the parenting plan or allocation judgment.  If, however, the movant satisfies his or her burden, the court next addresses whether modification of the parenting plan or allocation judgment is necessary to serve the child's best interests.  750 ILCS 5/610.5(c) (West 2018).

¶ 89      The circuit court's determination concerning parental responsibilities and custody, including modifications thereto, is afforded great deference because it occupies a superior position to assess the credibility of the witnesses and determine the best interests of the child.  See *In re Marriage of Lonvik*, 2013 IL App (2d) 120865, ¶ 33.  See also *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 15.  There is a strong presumption in favor of the circuit court's ruling (*In*

*re Marriage of Fatkin*, 2019 IL 123602, ¶ 32), and where the evidence permits multiple inferences, we will accept those inferences that support the circuit court's order (*In re Marriage of Bates*, 212 Ill. 2d 489, 516 (2004)). In other words, we view the evidence in the light most favorable to the appellee. *In re Marriage of Bates*, 212 Ill. 2d 489, 516 (2004). Because of this great deference, we will not disturb a circuit court's determination concerning the allocation of parenting time and parental responsibilities unless it is against the manifest weight of the evidence. *Lonvick*, 2013 IL App (2d) 120865, ¶ 33. "A judgment is against the manifest weight of the evidence when the opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Id*. (quoting *In re Marriage of Ricketts*, 329 Ill. App. 3d 173, 181 (2002)). Nevertheless, the discretion of the circuit court is not limitless, and it is the duty of the reviewing court to reverse a decision that is contrary to the manifest weight of the evidence. *In re Marriage of Bush*, 170 Ill. App. 3d 523, 529 (1988). "The paramount issue in all matters concerning custody of a child is his or her welfare." *In re Marriage of Fuesting*, 228 Ill. App. 3d 339, 344 (1992).

¶ 90                    Substantial Change in Circumstances

¶ 91    At the outset, we note that Patrick devotes several pages of his appellate brief to arguing that the circuit court's finding that there was a substantial change in circumstances was not against the manifest weight of the evidence. He stresses that the court found that "Theresa's conduct has caused a change in circumstances that necessitates a modification of the allocation of parental responsibilities in V.W.'s best interests," and that "Theresa's conduct has caused [V.W.'s] difficult family circumstances to adversely affect her emotional well-being," which "results in [her] general anxiety disorder." Patrick makes no mention in this portion of his brief to the court's similar findings pertaining to his own conduct, namely that "Patrick also has engaged in conduct to contribute to [V.W.'s] difficult family circumstances, adversely affecting her emotional well-

being, which manifests itself in her general anxiety disorder." As noted, the court found there were "significant instances where both parents have engaged in conduct that has caused a change in circumstances that has adversely affected [V.W.'s] best interests." We note that Theresa did not file a notice of appeal, and she argues that the circuit court's findings concerning the existence of a substantial change in circumstances and V.W.'s best interests are not against the manifest weight of the evidence. Because neither party challenges the circuit court's finding that a substantial change in circumstances occurred since the entry of the existing parenting plan or allocation judgment requiring a modification of the parenting order, and because our own review of the record convinces us that the circuit court's judgment on substantial change in circumstances was not against the manifest weight of the evidence, we need not further address Patrick's contentions. Accordingly, we next evaluate the second step of the analysis, namely, whether modification of the parenting plan or allocation judgment was necessary to serve V.W's best interests.

¶ 92                     Allocation of Parenting Time

¶ 93    After reviewing the record and the carefully considering the arguments of the parties, we cannot say that the circuit court's ruling allocating parenting time equally between them was against the manifest weight of the evidence.

¶ 94    As noted, Patrick argues on appeal that the circuit court "completely ignored" the recommendations of the GAL and custody evaluator, and that it "discounted and dismissed" the reports "with questionable rationale." He asserts that the court should have adopted their recommendations and allocated the majority of parenting time to him. The record, and most notably the detailed written findings made by the circuit court, belie his argument that it "completely ignored" or improperly "discounted and dismissed" the reports submitted by the GAL

and Dr. Goldstein. Rather, it demonstrates that the circuit court simply declined to adopt their ultimate recommendations, and it methodically detailed numerous areas where it felt they erred in their analyses. For example, the circuit court concluded that the GAL gave undue weight to statements V.W. made that were adverse to Theresa's interests, yet gave "no weight to [V.W.'s] statements adverse to Patrick's interest[s] as told to counselors or teachers or to Noell Dust." It also disagreed with the GAL giving weight to various statements by V.W. that the court did not find credible. Similarly, the court found that the GAL reached conclusions adverse to Theresa that were not supported by the evidence. By way of example, the court pointed to the GAL's conclusions that Theresa had a tutor complete V.W.'s homework, had falsely claimed that V.W. had learning delays and special needs, had attempted to have V.W. diagnosed with mental health problems requiring medication, and that she instructed V.W. to draw negative pictures of Patrick in her journal. The court similarly took issue with the GAL's conclusion that Patrick did not attend V.W.'s appointments to avoid conflict with Theresa, as it found that there was no evidence that this was the case. The circuit court also disagreed with the GAL's conclusion that Theresa made many of the educational and medical decisions in her own interests rather than V.W.'s, noting that all of the evaluations were recommended by school personnel or physicians. Indeed, it found that the V.W.'s counseling and tutoring were in her best interests. Finally, the court stated its view that the GAL gave insufficient weight to Patrick's contribution to the difficult family situation that causes V.W.'s general anxiety disorder.

¶ 95     The circuit court found similar flaws with the child custody evaluation prepared by Dr. Goldstein, albeit to a lesser extent. It found that Dr. Goldstein seemed willing to overlook Patrick's actions that contributed to the difficult family situation that causes V.W.'s general anxiety disorder. It acknowledged that Dr. Goldstein perhaps was unaware of many of those actions

because they were not referenced in his report but later came out at trial. The court also noted that Dr. Goldstein did not have the benefit of any direct information from V.W.'s teachers or tutor, and he was unable to connect with Mattison. These individuals, in the circuit court's view, provided essential testimony necessary for a complete evaluation of the case. The circuit court also found that Dr. Goldstein, like the GAL, gave undue weight to V.W.'s statements to him. The court recognized that V.W. likely made those statements to Dr. Goldstein, but it noted that V.W. had "made many contradictory and inconsistent statements about both parents to the GAL, Dr. Goldstein, teachers, and counselors." As such, the court expressed reluctance to give greater weight to the statements V.W. made to the GAL and Dr. Goldstein than to the contradictory statements she made to others. "[V.W.'s] statements represent her words and feelings at a particular point in time, filtered through the mind of a child with a sensory processing disorder. She has made different, inconsistent and at times contradictory statements to different people and counselors at different points at time." As such, the court was "concerned with the reliability of [V.W.'s] statements."

¶ 96    Patrick asserts that the circuit court improperly "use[d] the diagnosis [of sensory processing disorder] as justification for discrediting two professional opinions." We note that, tellingly, he does not dispute the circuit court's finding that V.W. made contradictory and inconsistent statements to various individuals. We also find no error in the weight the circuit court accorded the statements V.W. made to the GAL and Dr. Goldstein. We agree with Theresa that the circuit court properly recognized the age, maturity, psychological, developmental, and emotional abilities of V.W. in deciding how much weight to give her statements, and it explicitly recognized that the evidence demonstrated that V.W. had a history of making contradictory and inconsistent statements concerning both parents to her counselors, teachers, family, and the court-appointed

experts. Indeed, the statements she made to the GAL and Dr. Goldstein, as well as the contradictory statements she made to others, were pieces of the same puzzle that the circuit court put together in order to assess the credibility of her statements.

¶ 97 The court noted that both Dr. Goldstein and the GAL concluded Theresa coached V.W., yet disregarded evidence that suggested coaching by Patrick. The court pointed to Shores-Gaston's testimony that V.W. reported that her father told her she would have to see a judge and tell him where she wanted to live, and that her mother would have to go to jail. The court also noted that there was evidence that Patrick had recorded conversations with V.W, and it was explicitly "concerned that both parents have attempted to influence [V.W.]" Patrick asserts on appeal that "[t]he existence of the recordings is highly questionable," yet he fails to acknowledge his testimony that he *did* record various conversations with V.W. without her knowledge, notwithstanding his insistence that the conversations were "normal." We note that, in his motion to modify the allocation of parting time, Patrick raised the subject matter of some of the recorded conversations, namely V.W's clothing and homework, as a basis for a substantial change in circumstances. Moreover, Mattison's testimony was clear that she discussed the recordings with V.W. during therapy, that V.W. reported to her that she was worried about the recordings, and that they concluded that "we really shouldn't have to really worry about those things." We find no error in the circuit court's reasoned disagreement with the conclusions reached by the GAL and Dr. Goldstein concerning the attempts by both parties to coach V.W.

¶ 98 Put simply, the circuit court was permitted to place more weight on Mattison's professional opinion than on the reports prepared by the GAL and Dr. Goldstein. As pointed out by Theresa, we have stressed that the trial judge, as the trier of fact, is not required to accept the opinion of an expert on the "ultimate issue" of the placement of the child. See *In re Marriage of Gambla &*

*Woodson*, 367 Ill. App. 3d 441, 468 (2006). Indeed, "[p]rohibiting a trier of fact from rejecting an expert's opinion on an ultimate issue would usurp the role of the trier of fact." *Id.* As our supreme court has made clear, "[t]he weight accorded expert testimony must be decided by the trier of fact." *In re Glenville*, 139 Ill. 2d 242, 251 (1990).

¶ 99    We similarly disagree with Patrick's assertion that the circuit court's reliance on Mattison's opinion, who the circuit court explicitly found "most appropriately assessed the family dynamics and [V.W's] best interests," was unreasonable. Patrick argues that the circuit court "confused [V.W.'s] diagnosis of her sensory processing disorder to Faith Mattison and not to Dr. Griffith," and failed to "actually mention [Mattison's] opinion regarding [V.W.'s] best interest," because it did not reference her testimony that she found the GAL's report "very accurate" and that Patrick's household was more structured and organized than Theresa's such that it would help reduce V.W.'s anxiety. He asserts that, "[b]ased upon Ms. Mattison's twenty (20) years of experience, Patrick's household would help reduce [V.W.'s] anxiety[,] and placement with him would be in her best interest," and yet "the witness who the [t]rial [c]ourt places the most amount of reliance recommended that [V.W.'s] best interest would be advanced if she lived in a more stable environment, such as Patrick's home." In this regard, we note that Patrick's argument seems to suggest both that the circuit court simply did not understand Mattison's testimony and that she recommended that Patrick be allocated the majority of parenting time.

¶ 100   A review of the of the circuit court's memorandum of decision confirms that it did not "confuse" the source of V.W.'s sensory processing disorder diagnosis, as it states that Mattison "explained [V.W.'s] diagnosis of sensory processing disorder and general anxiety disorder and how the actions of both parents contributed to the 'difficult family situation' that caused [V.W's] anxiety." As outlined above, Mattison testified that she "had a report where [likely Dr. Dan

Griffith] had diagnosed [V.W.] with generalized anxiety disorder and sensory processing disorder." Mattison explained at the hearing that she had "to give a diagnosis on the first session, *** [s]o [she] took the diagnosis from the other doctors." Admittedly, the circuit court's statement that "Faith Mattison has diagnosed [V.W.] with sensory processing disorder" was somewhat inexact, but it was not inaccurate. Indeed, Mattison's testimony established that she was required to make a diagnosis during the first counseling session, and she adopted the diagnoses of prior medical professionals who had evaluated V.W. Thus, the circuit court was not "confused" when it stated that Mattison diagnosed V.W. with sensory processing disorder and generalized anxiety disorder, as Mattison's testimony was clear that she agreed with and adopted the prior diagnoses.

¶ 101 We also reject Patrick's characterization of Mattison's testimony concerning her ultimate opinion of V.W.'s placement. Patrick asserts that "[b]ased upon Ms. Mattison's twenty (20) years of experience, Patrick's household would help reduce [V.W.'s] anxiety, and placement with him would be in her best interest," and he faults the circuit court for "not actually mention[ing] Ms. Mattison's opinion regarding [V.W.'s] best interest even though the trial court found that she was the individual who most appropriately assessed the family dynamic and [V.W.'s] best interest." Like Patrick's argument regarding the original source of V.W.'s diagnoses, this argument appears to suggest that the circuit court misapprehended Mattison's testimony. From our review of Patrick's brief in conjunction with the applicable report of proceedings, it appears he extrapolated this assertion from the following exchange between Patrick's counsel and Mattison during cross-examination:

"Q. Have you, in the course of your investigation or counseling with [V.W.] and meeting with mom and what limited meetings you had with father, come to an opinion on whose home is more structured between the two households?

A. Dad's home is more structured.

Q. Okay. And you've, you've reached that opinion?

A. Yes.

Q. Okay. In your professional experience over the course of— you said it was 20 years—

A. Yes.

Q. —of practice with countless children, have you found that children who suffer from anxiety issues need more boundaries and structure in their lives in order to help address the anxiety of that patient or child?

A. They typically function, function better in an environment with, with boundary and structure.

Q. Okay. Now is that— I know that's your opinion. Is that also documented in books and, and just in your general field of psychotherapy as well?

A. Yes."

Patrick's counsel briefly revisited this line of questioning later in Mattison's cross-examination:

"Q. And do you recall telling me that if placement— if the court had decided that placement was with dad, that that would decrease [V.W.'s] anxiety and would help her?

A. Yes."

¶ 102    Patrick interprets Mattison's testimony far too favorably to his position, and his reliance on it to argue that the circuit court misunderstood her recommendations, or even that she recommended that Patrick be allocated the majority of parenting time, is misguided. As pointed out by Theresa, Mattison did not testify that she thought it was in V.W.'s best interests to reside

primarily with Patrick. After the above exchange, Mattison clarified during re-direct that, although Patrick's home was more structured such that it would reduce V.W.'s anxiety, it was necessary to balance those considerations with her other needs—such as parental support, patience, and understanding, in order allocate parenting time in a way that was best for her. Mattison made clear her opinion that "if you have structure, you always also have to have patience and understanding," and she previously testified that, for example, V.W. felt that Patrick would get impatient with her while they worked on her homework. Mattison further testified that V.W. "would lose something in support" if she was placed primarily with Patrick, citing her very close attachment to Theresa. Mattison emphasized that "that's [her] concern." The circuit court was explicitly persuaded by her opinions on these critical issues, as it stated in its memorandum of decision that Mattison "recognized the positive attributes that Patrick's more structured home would provide to [V.W.], but also recognized that Theresa needed to maintain parenting time with [V.W.] because of [her] attachment to her mother. Both parents needed to be actively involved in providing parenting for [V.W.] in order to serve [her] best interests. In [Mattison's] opinion, an equal parenting schedule would be in [V.W.'s] best interests." As demonstrated by these detailed findings, the circuit court clearly understood and fairly analyzed Mattison's testimony and "frank assessment" that a 50/50 allocation of parenting time was in V.W.'s best interests. Notwithstanding Patrick's assertion that "Mattison had contradictory testimony regarding what she believed was in the best interest of [V.W.]," her testimony regarding the ultimate allocation of parenting time is not reasonably suspectable to more than one interpretation, as she made clear during her direct testimony that, in her professional opinion, "50/50 placement would be best for [V.W.]"

¶ 103 We are also unpersuaded by Patrick's argument that the circuit court engaged in a "tortured and flawed analysis" by "inappropriately shifting [the] blame" to him and unfairly "minimizing

awful parenting by Theresa." He asserts that the circuit court "cast [him] in a negative light and unfairly rebuked him for (1) filing an ARDC complaint against Theresa's former attorney; (2) allowing V.W. to go into an inflatable bounce house after sustaining a then-undiagnosed concussion; (3) attempting to disrupt Theresa's relationship with Privett; and (4) complaining about the winter clothing V.W. wore during the transition periods between her parents' households.

¶ 104  Initially, we observe that this posture appears at odds with the first argument he advances on appeal—namely, that "the trial court correctly found a change in circumstances." Addressing the circuit court's analysis of a substantial change in circumstances, Patrick states early in his brief that he "takes no issue with the [t]rial [c]ourt's findings in this regard." However, every finding that he complains of in this subsequent portion of his appellate brief appears only in the segment of the circuit court's memorandum of opinion that addresses the presence of a substantial change in circumstances. The circuit court did not again reference these findings in weighing the statutory factors set forth in section 602.7(b) of the Marriage Act (750 ILCS 6/602.7(b) (West 2018)) in allocating parenting time. Nevertheless, we briefly address the findings he complains of.

¶ 105  Concerning the ARDC complaint, Patrick incorrectly asserts that the circuit court found that he "reported Theresa's former attorney to the ARDC which caused her former attorney to withdraw." Our review of the circuit court's memorandum of opinion confirms that the court did not find that the complaint *caused* Theresa's counsel to withdraw, but rather, it makes clear that this was simply Theresa's view. Patrick acknowledged to Dr. Goldstein that he filed the ARDC complaint, and the circuit court noted that "[Patrick] did not state the reason for making this complaint." Patrick asserts in his reply brief that he filed the complaint "for questionable ethics."

Whatever his reason for filing the complaint, we see no error in the circuit court pointing to it as an example of behavior that further fueled the conflict between the parties.

¶ 106   Similarly, the circuit court did not "unfairly" cast Patrick in a "negative light" regarding the other findings he complains of, including his "questionable" decision to allow V.W. to play in an inflatable bounce house while suffering from concussion-like symptoms, his efforts to interfere in Theresa's relationship with Privett, and his allegation of neglect concerning V.W.'s winter clothing, which the circuit court explicitly found frivolous.  In all three instances, the circuit court expressed its reasoned concern that Patrick's actions put unnecessary strain on his relationship with Theresa, worsening the family conflict to the detriment of V.W.'s mental health.

¶ 107   We also find meritless Patrick's assertion that the circuit court improperly minimized Theresa's share of the blame for the family conflict.  In its systematic review of each of Patrick's allegations concerning Theresa's conduct or parenting of V.W., the circuit court detailed several instances where it found she bore responsibility for worsening the family conflict.  For example, the circuit court took Theresa to task for, in its determination, facilitating the disclosure of the photos of V.W. in a bathtub to Shores-Gaston in order to have the matter reported to DCFS, and it found unreasonable her belief that the photos were inappropriate.   It also found her request for an order of protection based on the photos caused emotional distress to Patrick and V.W., as well as harmed Rena's relationship with V.W.  It further chastised Theresa for frivolously calling the police on Patrick, maintaining a disorganized and messy house, twice interfering with Patrick's ability to take V.W. to the father/daughter dance, and not intervening in Privett's decision to discipline Mackenzie by putting a jalapeno pepper in her mouth, "which was excessive and clearly in bad judgment," which caused V.W. to become anxious and upset.

¶ 108   The circuit court, after weighing all the evidence, exhibits, recommendations of various experts, and the arguments of counsel at an extensive hearing, found that "both parents have engaged in conduct that has caused a change in circumstances that has adversely affected [V.W.'s] best interests," and that "the parental conflict itself has been the cause of much of [V.W.'s] anxiety." It went on to state that, "[a]lthough Theresa has engaged in behavior that has caused a change in circumstances that has adversely affected [V.W.'s] best interests, both parents bear responsibility for this conflict." It also noted that "Patrick *** has engaged in conduct to contribute to [V.W.'s] difficult family circumstances, [and] adversely affecting her emotional well-being, which manifests itself in her general anxiety disorder." The circuit court assessed the actions of each parent and made plain its criticisms of those actions where it felt appropriate. We see no error in the circuit court attributing some of the blame to Patrick for the family conflict. Put simply, the circuit court did not spare either parent from its disapproval for their respective contributions to the family conflict, and the circuit court's ultimate judgment on best interests was not against the manifest weight of the evidence.

¶ 109                     Patrick's motion *in limine*

¶ 110   Patrick's final argument on appeal is that the circuit court erred in denying the bulk of the relief he sought in his motion *in limine* and allowing three witnesses to testify because they were disclosed "on the eve of trial." He asserts that at 4:58 p.m. on the Friday before trial was to begin the following Monday, Theresa submitted her final witness list which included four additional witnesses that she had not previously disclosed in her discovery responses. Specifically, she identified (1) Theresa's mother, Donna Paradiso; (2) Privett; (3) the parties' mediator, Lu Jenkins; and (4) V.W.'s tutor, Melissa Dunham, as testifying lay opinion witnesses. Patrick filed a motion *in limine*, asserting that the additional, "previously undisclosed persons," were improper and

highly prejudicial. The motion sought to bar their testimony, as well as bar the admission of any documents other than those already tendered by Theresa in her prior discovery responses. During argument on the motion *in limine*, Patrick pointed out that Theresa's counsel had tendered 13 additional pages of documents that morning. After hearing the arguments of counsel, the circuit court largely denied Patrick's motion *in limine* in that, citing confidentiality concerns, it barred only the parties' mediator from testifying. However, it allowed the remaining three witnesses to testify, and it further allowed the admission of the additional 13 pages of documents.

¶ 111 Illinois Supreme Court Rule 213 (eff. Jan 1, 2018) governs discovery by written interrogatories, including the disclosure of lay witnesses who will testify at trial. See Ill. S. Ct. R. 213(f)(1). Rule 213(f)(1) defines "lay witness" as "a person giving only fact or lay opinion," and requires the party to "identify the subjects on which the [lay] witness will testify." As pointed out by Patrick, Rule 213 also requires a party to "seasonably supplement or amend any prior response whenever new or additional information subsequently becomes known to that party." *Id*. at 213(i). The exclusion or admission of evidence by the circuit court, including lay opinion witness testimony, is reviewed for an abuse of discretion. *Boyd v. City of Chicago*, 378 Ill. App. 3d 57, 67 (2007). An abuse of discretion occurs only where no reasonable person would take the view adopted by the circuit court. *Id*. The factors that the circuit court must consider when deciding whether to impose a sanction, such as barring witness testimony for a discovery rule violation, include: "(1) the surprise of the adverse party; (2) the prejudicial effect of the witness' testimony; (3) the nature of the testimony; (4) the diligence of the adverse party; (5) the timeliness of the objection; and (6) the good faith of the party seeking to offer the testimony." *Id*. at 68 (quoting *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 621 (2007)).

¶ 112    We determine that the circuit court did not abuse its discretion in allowing Theresa's mother, Privett, and V.W.'s tutor to testify at trial, as well as in allowing the 13 pages of additional documentation.  Although Theresa's disclosures were certainly "last minute," we note that the circuit court asked both Patrick and Theresa's counsel if there was an order in place that established a deadline for the completion of discovery, and both answered in the negative.  Contrary to his assertion, Patrick was in no way "ambushed" because, as noted by the circuit court, the disclosure of Theresa's mother, Privett, and V.W.'s tutor, was not an undue surprise because Patrick knew of all the proposed witnesses and their connection to the case, and the GAL interviewed Privett and included a summary of their discussion in her report.  Moreover, the circuit court, within its discretion, determined that there was no surprise or undue prejudice to Patrick because none of the additional witnesses would be called to testify for at least another two weeks.  The circuit court went on to state that, "in all candor, [they] are probably people who are going to be needed for me to really understand [and] make a decision here."  Within its discretion, the circuit court also properly denied the motion *in limine* concerning the 13 additional pages of documents, as there was no surprise or prejudice to Patrick because the documents consisted of examples of V.W.'s homework and an invoice for the purchase of school uniforms.  These determinations were reasonable in light of the circuit court's explicit need to hear the proposed testimony and view the evidence in order to make a fully informed decision in V.W.'s best interests.  Accordingly, the circuit court did not abuse its discretion concerning Patrick's motion *in limine*.

¶ 113                                III.  CONCLUSION

¶ 114   For the reasons stated, we affirm the judgement of the circuit court of Winnebago County.

¶ 115   Affirmed.